# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00367-CV

---

**Timothy Onkst, Appellant**

**v.**

**Jennifer Morgan, Appellee**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-14-003084, THE HONORABLE TIM SULAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Timothy Onkst complains of the trial court's February 2017 protective order, barring him from communicating with, threatening, harassing, or approaching appellee Jennifer Morgan and several members of her family. The trial court signed a final order in a suit affecting the parent-child relationship (SAPCR order) in April 2018, incorporating the protective order. Onkst appeals from the protective order and the provisions of the SAPCR order that incorporate the protective order. As explained below, we will affirm the protective order.

### STANDARD OF REVIEW

A trial court may issue a protective order if it finds that family violence has occurred and is likely to occur in the future. Tex. Fam. Code § 85.001(b). In issuing a protective order against someone who has committed family violence, the court may prohibit that person

from: committing family violence; threatening a protected person or a member of the protected person's family or household directly or through a third-party; communicating in any way with a protected person or a member of her family or household other than through an attorney or someone appointed by the court; going near the home or workplace of the protected person or a member of her family or household; going near a protected child's home, child-care facility, or school; engaging in conduct that is specifically directed toward a protected person or a member of her family or household and that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass, including following the person; possessing a firearm if the subject of the order is not an actively employed peace officer for a governmental entity; and harming, threatening, or interfering with the care or control of a pet of the protected person or a member of her family or household. *Id*. § 85.022(b). The court may render a protective order that lasts longer than two years if, as relevant to this case, it finds that the subject of the order was also the subject of at least two previous protective orders that were rendered to protect the current applicant, that the subject had committed family violence, and that the subject is likely to commit family violence in the future. *Id*. §§ 85.001(d), .025(a-1).

We review a trial court's issuance of a protective order under the same standards used in evaluating the sufficiency of the evidence following a jury verdict. *S.N. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00539-CV, 2019 WL 471069, at *3 (Tex. App.—Austin Feb. 7, 2019, no pet.) (mem. op.) (citing *B.C. v. Rhodes*, 116 S.W.3d 878, 883 (Tex. App.—Austin 2003, no pet.)). In reviewing legal sufficiency, we view the evidence in the light most favorable to the trial court's determination, indulging all reasonable inferences in its favor; in reviewing factual sufficiency, we consider all of the evidence and will uphold the finding unless the evidence is too weak to support it or the finding is so against the

2

overwhelming weight of the evidence as to be manifestly unjust. *Id.* The trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony, and we will not substitute our judgment simply because we might reach a different conclusion. *Id.*; *B.C.*, 116 S.W.3d at 884.

## FACTUAL AND PROCEDURAL SUMMARY

Onkst and Morgan were divorced in 2013,[1] when the trial court signed a decree that included possession and child-support provisions related to their child, "Billie," who was born in 2011.[2] Soon after the decree was signed, Onkst and Morgan began filing motions for enforcement and petitions to modify the parent-child relationship. In October 2012 and January 2015, Morgan obtained two protective orders against Onkst that each had two-year terms. In February 2017, the trial court held a hearing on Morgan's request for a third protective order.

At the hearing, Travis County Deputy Constable Kasben Harris testified that she provides security at a facility called PlanetSafe,[3] the service that Onkst and Morgan use to

---

[1] Although Onkst states that the parties were divorced on March 4, 2014, and Morgan says they were divorced in 2012, the record reflects that the trial court initially heard the case in March 2013, that further hearings were held in July and August 2013, and that the trial court heard the parties' agreement as to possession and signed the final decree on December 12, 2013.

[2] To protect her privacy, we will refer to the child by the alias of "Billie." When other adults involved in this case share the same surnames as Morgan and Onkst, we will refer to them by their first names.

[3] PlanetSafe is a Travis County Supervised Visitation and Safe Exchange Program. The record contains the PlanetSafe manual, which explains that there are separate entrances for custodial and noncustodial parents, that there would be "physical and visual separation" between parents, and that "[o]nly family members named on the Court Order may have access to visitation services." Harris testified that PlanetSafe has two parking lots—one for custodial parents and one for noncustodial parents—and that a parent dropping off a child is required to wait inside the facility for about thirty minutes after relinquishing custody of the child. The

supervise their exchanges of Billie for visitation. In early January 2017, she saw a "suspicious male person" go behind the building and investigated when she did not see him come out within a few minutes. Harris found Onkst's father, Raymond Dwight Onkst, who goes by "Dwight," in a parking lot adjacent to the facility, "looking down the alleyway to" the custodial-parent parking lot used by Morgan, having positioned himself to have a "clear view of those leaving" the facility. Harris, who knew that Morgan had arrived at the facility to pick up Billie, asked what he was doing and why he was there. He told her "that he was not on PlanetSafe property" and "that it was public property and he could be there." She said he should leave, and he "was a little defiant at first." He then walked away and stood across the street until he left in a car with Onkst. Harris testified that after that interaction, she learned that Morgan "had just left before" Harris saw Dwight watching the parking lot. Harris testified that Dwight's behavior violated PlanetSafe's policies.

Harris stated that during Onkst's supervised exchanges, he has called her "the N word" and "Shaniqua," rather than using her name, which is written on her nametag, and that he has said "that I probably had 50 million kids and didn't know the fathers." She further testified that Dwight has "called me stupid" and told her that he had "never seen someone like myself being so unprofessional when all I was asking was for them to empty their pockets, which is the process." Harris said she had not had any similar problems with other noncustodial parents and testified, "As a matter of fact, on one of those occasions, a couple of the fathers, they were bothered by the statements . . . [the Onksts] were saying to me, and started an exchange. And I had to intercede and ask them to just, you know, ignore them."

---

parent who is picking up the child generally leaves immediately after getting the child, although the custodial parent may opt to speak to a counselor first.

Rebecca Wooten testified that she was a friend of Morgan and Morgan's new husband, Keith, and that she was Keith's realtor when he decided to sell his house in 2016. In December 2016, someone calling himself "Ray Onkst" contacted her online to ask, "Is this home vacant? Seems to be far overpriced. If not vacant, why are the occupants moving?" Recognizing Onkst as Morgan's former name, Wooten immediately contacted Morgan and asked if she knew someone named Ray Onkst. She also blocked "Ray Onkst" from being able to contact her in that way. Although Wooten said that possible buyers frequently ask if a home is vacant, she also said, "Knowing what's going on, I was a little concerned. It's kind of creepy."

Anji MaCuk owns an investigation agency and testified that she was hired by Onkst to investigate where Morgan was living for purposes of a "possible change of venue." She said that her employees did "basic surveillance" at Keith's residence and at Morgan's mother's residence. She did not think her investigators had gone to Keith's or Morgan's places of employment but was not positive because she did not do the investigation herself. MaCuk testified that Onkst never seemed angry or violent in his communications and that her agency would not have accepted the job if he had. She also said that if she had known there was a protective order issued against Onkst, she would have insisted on communicating any information to his attorney, rather than giving it to Onkst himself.

Morgan testified and explained that part of her reason for seeking a third protective order was that Onkst had located and emailed Tina Morgan, who is Keith's ex-wife. In the emails, which were introduced into evidence, Onkst said, "I'd like to talk to you about Keith Morgan, I think you would be interested in what is going on and I'd like to ask you some things about him and their situation." Tina responded, "How do you know Keith Morgan and why are you contacting me," and Onkst replied:

5

I don't know him and I wasn't sure but I was pretty sure you were his ex.  I'd like to know about the situation with him and anything else you could share.

I have a 4-year old daughter (who I share custody of) who has told me that her mother has evidently moved in (and in turn my daughter part time) with Keith Morgan and his 2 children . . . .  Though I'm sure he is probably a far better person to be around children than my ex, it is still a tad disconcerting on my end.

Tina told him that Keith "is good with children" and "a good dad" and asked, "Are you telling me there is information regarding their situation that I need to be aware of?"  Onkst responded that he and Morgan had an ongoing custody dispute and that:

My ex has in the past used her living situation (among other things) to attempt to get more child support, alter or cut visitation schedules.  Among our disputes have been her allowing people with sexually related arrests including her brother in law around my daughter.  So I wanted to know as much about this situation as I could.  I know that there is a significant age differential and I thought that was odd as she is in her early 30's. . . .  I'll say that if I were you, there is no person I can think of that would be worse to be around your children than my ex-wife. . .   So I feel for you as I just know that this isn't a good thing for her to be around or interacting with your kids.

Tina wrote that she would have a conversation with Keith to "address" the "brother-in-law situation" but said that Onkst's description of Morgan did not match Tina's impression after having met her several times.  Morgan testified that Tina met with her soon after and gave her print-outs of the email exchange.  She said that when she saw Onkst's emails,

I was just embarrassed and felt that thank goodness Tina knows me as a person and knows Keith as a person, because if she didn't, that information that he sent her, the lies that he said about me, could have easily torn apart our family.  And I'm just thankful that we have that relationship.  And so I got the information and just thought it was another way he's coming towards me and trying to harass me and my new life.

6

Morgan also testified that she viewed Onkst's emails to Tina as threatening because he "was trying to tear apart our relationship."

As for Wooten's testimony, Morgan explained that when she learned that someone calling himself "Ray Onkst" had contacted Wooten to ask if Keith's house was vacant and why the previous owner had moved, Morgan was worried, scared, embarrassed, and again felt forced to share personal information about her relationship with Onkst—information that she does not "wave around and share with people." She felt threatened by Dwight's contacting Wooten because, "It's controlling me. It's trying to pry into my life again. It's none of his business. . . . All it is, is it scares me and it just makes—it's just a constant, [Onkst] and [Dwight], all involved in trying to find out my information."

Morgan said Onkst's misbehavior at PlanetSafe started after he learned that she was seeing Keith. Although she never witnessed it, she knew Billie was present at least once because she "came back to me . . . with her arms just like out to me and tearing up." Morgan thought Onkst's behavior at PlanetSafe was "his way to get them shut down or to get us kicked out, because I feel like he doesn't like to follow the rules. He doesn't like us to be protected." Morgan read in one of PlanetSafe's incident reports that Onkst had complained that she was near the facility when he was there and found it "very alarming" that he knew that she was waiting in a nearby coffee shop to retrieve Billie. Morgan was also scared when she learned that Dwight had been watching her parking lot because she had had problems with him "keeping his distance" and violating boundaries.

Morgan further testified that in the latter part of 2016, Onkst disclosed information that he would not know unless he was following her or having her followed. For instance, he knew Keith's last name although Billie, who was three at the time, "didn't know

7

Keith's last name. We made a point because we knew . . . , given his history with me, he was going to, you know, contact them, harass them. So it was Mr. Keith—Keith from day one. We never said his last name." Onkst also knew where Keith's house was, and Morgan said that the fact that he was "able to find out who Tina Morgan was, I was just in shock that day she told me." Morgan related that Billie had a video call with Onkst while she was at a neighbor's holiday party with Morgan and Keith. Morgan testified that Onkst asked Billie where she was and that when Billie said "at the neighbor's," Onkst said:

> Jessica, the neighbor. And that's when I was just, like, wow, how did he know that? Because there's no way he would have known that information. . . . [T]he information that Tim was saying to her, like he knew—I don't remember the exact words that he said, but he knew that their kids were grown and that they had grandkids. And I was just—to know that information was shocking to me, and it was just very uncomfortable. And he had said something to the extent of their hot tub and pool. These are the neighbors with the hot tub and pool. So immediately when I got off the phone, I contacted [her attorney] the next day and I was, like, wow, he knew this information. It just blows my mind how somebody would know all this stuff about Keith and me.

Although Morgan said she was not afraid of the private investigators themselves, she also said:

> I don't think that [Onkst] or his father have any right to know my schedule or my locations at all times. I think that is serious danger for them to know when I'm by myself, when I'm with my husband, and to know my routine and schedule. Why would anybody with this given history be able to know my location, or his father?

Morgan conceded that Onkst had not committed physical violence since the first protective order was issued, but when asked if he had "done any threat that recently places you in fear of imminent physical harm, bodily injury, assault, or sexual assault," she answered, "All of the following, stalking. I am scared. I do feel threatened. I do feel them watching where I park

8

and knowing my information and having me followed.  I do feel that's a threat."  Morgan testified that "he is harassing me, he is trying to interfere with my new life, and I can't get him to stop."  At another point, she said, "[I]t's just like [Onkst and Dwight] won't stop.  They won't leave me alone.  And, again, it's just—they are just constantly involved, trying to get involved in my life and it's not okay."  Morgan testified that "it is not good for [Onkst or Dwight] to be able to know my location at all times, given his history," and that it makes her feel "very uncomfortable and harassed."  She said that Onkst's investigating her schedule and daily routines felt like "another way for him to control me, another way for him to make me scared."  She testified that she worried about things like going to the grocery store alone because, "They know my location.  They know I'm by myself. . . .  I don't think it's safe at all for him to be allowed to have me followed."  Morgan said that she wanted a permanent protective order because:

> We've had a protective order since we've been divorced, before that, and things have not gotten better.  And—with him or his father.  I don't see any progress in that area towards me.  They still want to know about my life, they still want to control my life, they want to scare me.  And there's a protective order in place, there's been two, and it has been violated every time.  So I can't imagine leaving here today without a protective order.

Onkst testified that he regretted telling Tina Morgan that he could not imagine a worse person than Morgan to allow around a child.  Onkst said that he learned Tina's name and contact information by looking up her and Keith's divorce records and that he contacted her because Morgan had in the past "had sexually-related offenders around her"[4] and he wanted to

---

[4] Onkst said that Morgan's brother-in-law had "exposed himself to a woman and a five-year-old girl" and that she had allowed Onkst's maternal grandfather, who had been "found civilly liable in Florida and Texas of fondling, including attempting to fondle [Onkst]," to be around Billie "at least for a brief period."  When Morgan was asked about her brother-in-law's alleged offense, she said, "That's not true either.  And it's been brought up in several court cases

find out if Keith "was a sexual offender." He denied that his purpose in contacting Tina was to cause conflict between her and Morgan.

Onkst testified that he gave the private investigators what he believed to be Keith's address, which he got from the county's property records, and asked them to determine whether Billie was living at that address because he wanted "to prove that they lived in Williamson County." Onkst believed that the investigators had gone to Keith's home; "driven by" the school where Morgan works; "been by the school" where Keith was a principal; and parked outside of both schools. He did not know if they had gone to Morgan's mother's home.

Onkst denied using racial slurs against Harris and said she had threatened him and used derogatory language toward him. He also denied asking his father to surveil Morgan's parking lot in January 2017 or to contact Keith's realtor, said he did not know that his father had intended to take those actions, and did not believe that his father had done either alleged action. Onkst testified that if Morgan or her family had engaged in the kind of behavior attributed to him and his father, he would not find that behavior annoying, alarming, or harassing. He denied ever committing family violence against Morgan and accused Morgan of making false accusations, of threatening to keep him from seeing Billie, and of saying "she can do this forever" and "[n]o judge will believe me." He said he only wanted to have visitation with Billie and did not want to control Morgan or interfere with her private life.

Dwight testified and denied sending any messages to Keith's realtor. He denied that either he or Onkst used racial slurs or insulting language toward PlanetSafe employees. As for the incident in the PlanetSafe parking lot, he said that he "was in a public parking lot about

---

by Tim and it has been thrown to the side because it's not true." Morgan was not asked and did not testify at all about Onkst's allegations related to his own grandfather.

200 yards from—maybe 250 yards from the PlanetSafe entrance," that he was waiting near the car to be sure the car was not vandalized, and that he had not walked down an alley or looked toward Morgan's parking lot.

In February 2017, after the hearing, the trial court rendered the third protective order, effective for the duration of Morgan's life.[5] The trial court also signed findings of fact, including determining that Onkst had committed family violence in the past and had been found likely to commit family violence in the future; had been the subject of two past protective orders rendered to protect Morgan; and had violated the second of those protective orders in the following ways:

- by contacting Tina and making disparaging remarks to her about Morgan. Onkst located Tina via Linked-In and then emailed her in March 2016, saying that "there is no person I can think of that would be worse to be around your children than my ex-wife." The court found that Onkst's emails to Tina forced Morgan to disclose private and embarrassing information and that his behavior was intended to disrupt and exercise control over Morgan's relationship with Keith.

- by indirectly communicating with Keith's realtor, who was a friend of his, to ask why Keith was moving. The court found that that inquiry, made in December 2016 by Onkst's father, forced Morgan to disclose private and embarrassing information, and that Morgan was alarmed because Onkst and his family "were attempting to gather personal information about" Morgan and Keith.

- by hiring a private investigator to follow Morgan without informing the investigator about the protective order.

- by behaving aggressively at the exchanges of the child, sometimes when Billie was present, resulting in multiple incident reports and a temporary suspension of services. The court stated that Onkst was written up seven times by PlanetSafe staff for behaving aggressively; that, other than the reports about Onkst, PlanetSafe staff had only made two other incident reports in the previous four years; and that PlanetSafe suspended services to Onkst and Morgan for thirty days in the fall of 2016, something it had never before had

---

[5] The trial court actually signed two protective orders in February 2017—one on February 9 and the second on February 22, titled, "Protective Order Nunc Pro Tunc." The two orders are identical except for the inclusion of the parties' names in the order nunc pro tunc. We will focus our analysis on the order nunc pro tunc.

11

to do. Finally, the court noted that another supervised visitation center had earlier terminated services to the family because of Onkst's aggressive behavior.

- by allowing his father to go to PlanetSafe in January 2017, where he "surveill[ed]" Morgan's parking spot—Onkst's father was "found standing near Jennifer Morgan's designated parking lot," in violation of PlanetSafe's policies.

In its April 2018 SAPCR order, the trial court stated that because the protective order prohibits Onkst from contacting Morgan's employer or going near her place of work—the same school Billie attends—Onkst could not attend school activities or meetings or contact school officials. It further ordered that PlanetSafe would supervise exchanges of possession of the child; that Onkst was permanently enjoined from going near Morgan's residence or place of employment; that Dwight was not allowed "to be the person who performs the exchanges of the child"; and that the protective order would supersede any conflicting provisions in the SAPCR order.

## DISCUSSION

In his first issue, Onkst argues that two of the alleged violations cited by the trial court were committed by Onkst's father and thus cannot be used as a basis for the protective order against Onkst; that two other violations were "directed at" Keith's ex-wife, a non-protected person, and involve the exercise of Onkst's free speech; and that there was no evidence that Onkst or anyone following his instructions followed Morgan.

Initially, although Onkst and Dwight denied that Dwight had surveilled Morgan's parking lot and instead asserted that Dwight was simply standing on a public street or right of way, Deputy Harris testified to the contrary. The trial court as trier of fact could choose to believe or disbelieve the witness testimony, *see S.N.*, 2019 WL 471069, at *3, and it determined

that Dwight had been watching the parking lot in violation of PlanetSafe rules.  We will not substitute our judgment for that of the trial court on issues of witness credibility.  *See id.*

As for Dwight's contacting Wooten, Onkst argues that his father simply "inquired about the pricing of the home . . . and about whether the home was vacant"; that the inquiry was directed specifically at Wooten and not Morgan; that Morgan was not aware of the inquiry until Wooten told her about it; and that the inquiry cannot be considered reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass Morgan.  Although it is true that Dwight did not contact Morgan or Keith directly, Wooten testified that she found Dwight's question about why the owners had moved out "creepy," and as a result of Dwight's contact, Morgan felt compelled to disclose embarrassing information that she had sought to keep private.

Onkst, who notes that he was not present when Dwight was found watching Morgan's parking lot at PlanetSafe, argues that Dwight's conduct cannot be imputed to him.  However, the January 2015 protective order provided that Onkst was prohibited from "giv[ing] permission to anyone to ignore or violate any provision of this order."  On this record, the court could reasonably have determined that Dwight had acted on Onkst's behalf and encouragement.  We can find no error in the trial court's determination that Dwight's conduct could be attributed to Onkst, was in violation of the January 2015 protective order, and was directed at Morgan.

As for Onkst's statements to Tina Morgan, he again notes that Morgan did not know about them until she was informed by Tina and insists that his contact with Tina was not directed at Morgan and did not involve threats of violence.  Instead, he asserts, the email exchange shows a "conversation between two people concerning their children and former spouses."  However, Onkst's telling Tina that Morgan should not be allowed around Tina's children can reasonably be considered to be directed at Morgan.  Regardless of whether he knew

13

Tina, Keith, and Morgan were friends, such a statement would almost certainly make its way back to Morgan, whether through Tina acting as a concerned friend, as was the case here, or by way of an upset ex-spouse raising concerns about whether her children should be protected from Morgan. As a result of Onkst's communications with Tina, Morgan again felt compelled to disclose information she found embarrassing. Further, Morgan testified that she was alarmed to realize that Onkst was digging into Keith's personal life. The trial court did not err in determining that Onkst's contacting Tina violated the January 2015 protective order and was directed specifically at Morgan.

As for hiring the private investigators, Onkst contends that there was no evidence that Morgan was followed by the investigators, nor was there evidence about how close the investigators came to Morgan's residence. However, although MaCuk testified that she thought her investigators only "did a few drive-bys" of Keith's residence and that she did not think they had gone to Morgan's or Keith's places of employment, Onkst himself believed they had gone to the two schools, and Morgan testified, "It's embarrassing to me to have somebody go to my school and to my husband's school to try to find out information." Further, Morgan testified that Onkst knew detailed information about her neighbors and their home, which could indicate that someone provided him with information gleaned from close investigation. She also testified that she was alarmed by Onkst's efforts to know the details of her life and routines. On this record, we hold that sufficient evidence supports the trial court's determination that Onkst's hiring of investigators violated the January 2015 protective order and was directed at Morgan.

Finally, Onkst contends that his aggressive behavior during exchanges was directed at PlanetSafe staff, not at Morgan; that it was not done in her presence; that he never made threatening, harassing, or disparaging remarks about Morgan; and that violating PlanetSafe

14

rules is not a statutory basis for finding a protective-order violation. However, we have already held that sufficient evidence supports the trial court's determinations of other violations of the January 2015 protective order, and we therefore need not consider whether Onkst's behavior at PlanetSafe violated the earlier order or was directed at Morgan. *See* Tex. R. App. P. 47.1.

Morgan testified that she felt alarmed, embarrassed, and harassed by Onkst's and Dwight's behavior—using Keith's divorce records to find Tina's and Wooten's contact information, hiring someone to investigate her home and her and Keith's workplaces, and watching the parking lot she used at PlanetSafe. Because of their conduct, Morgan felt forced to disclose personal information she had hoped to keep private. Onkst also knew details about Keith's neighbors that made Morgan believe he was following her, having her followed, or had somehow hacked into her email, and she was alarmed that Onkst and Dwight knew so much about her life and her whereabouts. Finally, Morgan testified that Onkst's conduct was part of an ongoing campaign to control and interfere with her life. We hold that sufficient evidence supports the trial court's determination that Dwight's behavior could be attributed to Onkst and that Onkst's and Dwight's conduct was directed at Morgan and violated the January 2015 protective order. *See S.N.*, 2019 WL 471069, at *3. We overrule Onkst's first appellate issue.

In his second issue, Onkst challenges the trial court's decision to make the protective order effective for the duration of Morgan's life. *See* Tex. Fam. Code § 85.025(a-1) (explaining when protective order may be made to last longer than two years). First, he notes that Keith and Billie were not protected people under the prior protective orders and argues that the February 2017 protective order in favor of them should therefore be reversed. Second, he asserts that because there was no evidence that he had committed family violence while the

15

January 2015 protective order was in effect, the trial court erred in issuing a protective order that lasts the duration of Morgan's life.

Section 85.025 allows a trial court to render a protective order for a period exceeding two years if it finds that the person who is the subject of the protective order (1) was also the subject of at least two previous protective orders that were rendered to protect the applicant and (2) has committed family violence and is likely to do so in the future. *Id.* § 85.025(a-1)(3). It does not require a determination that the subject of the order have committed family violence within the most recent protective order's effective time period. *See id*. In its protective order, the trial court found that Onkst "was the subject of two or more previous protective orders rendered to protect" Morgan and that he "was found to have committed family violence and was likely to commit family violence in the future." The court therefore made the requisite findings to support a protective order lasting longer than two years. *See id.*

Further, section 85.025(a-1) allows a court to render a protective order effective for more than two years "to protect the applicant and members of the applicant's family or household." *Id*. § 85.025(a-1). Thus, having made findings that satisfy the requirements of section 85.025(a-1)(3), the court was authorized to issue an order protecting Morgan *and members of her family or household*, including Keith, Billie, and Morgan's mother. *See id.* We overrule Onkst's second issue on appeal.

In his third issue, Onkst argues that the court should not have included Billie, Keith Morgan, or Morgan's mother as protected people because there was no evidence that he was a threat to them. Onkst's full argument in support of this issue is that "[t]here is simply no evidence in the record to support any finding that Tim Onkst committed family violence towards

16

Keith Morgan, [Billie] and [Morgan's mother].  Accordingly, the protective order as to those persons should be reversed and an order denying the protective order as to those persons should be rendered."  However, as noted earlier, upon making the required findings, a trial court is allowed under section 85.025(a-1) to issue a protective order "sufficient to protect the applicant and members of the applicant's family or household."  *Id*.  The court was therefore statutorily authorized to include the members of Morgan's family and household in the protective order.  We overrule Onkst's third issue.

## CONCLUSION

We have overruled Onkst's issues on appeal.  We therefore affirm the trial court's February 2017 protective order and the April 2018 SAPCR order.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed:   September 11, 2019

17